**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**ANGEL R. BRITTON,**

                    **Plaintiff,**

    **v.**                                                             **5:13-cv-00907**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

                    **Defendant.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**THOMAS J. McAVOY**
**Senior United States District Judge**

## DECISION and ORDER

       Plaintiff  brought this suit under § 205(g) of the Social Security Act ("Act"), as amended, 42

U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security ("Commissioner")

denying her application for supplemental security income (SSI) benefits under Title XVI of the Social

Security Act.  Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") denying the

application for benefits is not supported by substantial evidence and contrary to the applicable legal

standards.  The Commissioner argues that the decision is supported by substantial evidence and made

in accordance with the correct legal standards.  Pursuant to Northern District of New York General

Order No. 8, the Court proceeds as if both parties had accompanied their briefs with a motion for

judgment on the pleadings.

**I.      PROCEDURAL HISTORY**

       On August 9, 2010, Angel R. Britton ("Plaintiff") protectively filed an application for

Supplemental Security Income.  Administrative Transcript ("T") 122-25.  Plaintiff alleged disability

beginning April 16, 2010 due to bipolar disorder and anxiety. T 131, 135. On November 17, 2010,

Plaintiff's claim was initially denied. T 47-52. On December 7, 2010, Plaintiff filed a request for a

hearing before an Administrative Law Judge ("ALJ"). T 57. Her request was granted, and on

November 17, 2011, a hearing took place before ALJ David S. Pang. T 13-30. On January 21, 2012,

the ALJ denied Plaintiff's application. T 33-46. On February 1, 2012, Plaintiff filed a request for a

review of the ALJ's decision. T 12. On June 10, 2013, the Appeals Council denied Plaintiff's

request. T 1-6. This action followed.

## II.    FACTS

The parties do not dispute the underlying facts of this case. The Court assumes familiarity

with these facts and will set forth only those facts material to the parties' arguments.

## III.    THE COMMISSIONER'S DECISION

The ALJ first determined that Plaintiff did not engage in substantial gainful activity during the

period from her application date of August 9, 2010, through the date of the ALJ's decision, January

21, 2012. T 38. The ALJ considered the medical and other evidence of record, and found at step two

of the sequential evaluation that Plaintiff had the "severe" impairments of anxiety, depression, and

adjustment disorder with disturbance of conduct. T 38. At step three, the ALJ determined that

Plaintiff's severe impairments did not meet or medically equal the criteria of any impairment

contained in the Listing of Impairments. T 38-39. The ALJ then concluded that Plaintiff retained the

residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but would need to avoid concentrated use
> of all heavy moving machinery such as automobiles and forklifts. The claimant would need to
> avoid all concentrated exposure from all unprotected heights and would be precluded from
> working in fast-paced production rate environments. The claimant would be able to tolerate
> only occasional and superficial direct customer service interaction with the public; however,

the claimant would [*sic*] the claimant is able to understand, remember, and carry out simple instructions and make judgments on simple work related decisions. The claimant is able to interact appropriately with supervisors and coworkers in a routine work setting and respond to the usual work situations and to changes in a routine work setting.

T 39-40.

In reaching the RFC determination, the ALJ considered Plaintiff's subjective complaints of pain and functional limitations, but determined that they were not entirely credible. T 39-42.

At the fourth step, the ALJ concluded that Plaintiff could not perform her past relevant work as a sandwich maker. T 42. At the fifth step, the ALJ considered Plaintiff's vocational factors of age (younger individual), RFC, and general equivalency diploma (GED), applied the corresponding Medical-Vocational Guideline (Rule) 204.00, and reached the determination that Plaintiff could make an adjustment to other work existing in significant numbers in the national economy within the framework of the Rule. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 204.00; Social Security Rulings (SSR) 83-14, 85-15. T 42-43. However, the ALJ found that the full range of work was compromised by Plaintiff's nonexertional limitations. The ALJ considered the testimony of Alana Curtanic, the vocational expert (VE). T 27-29. Ms. Curtanic testified that a hypothetical person with the same age, education, work experience, and RFC as Plaintiff could perform work as a hospital cleaner, laundry worker, and kitchen worker. T 27-29. The VE also testified to the number of these jobs in the national and local economy, which the ALJ found constituted a significant number of jobs in the national economy. T 43; T 27-29. Accordingly, the ALJ concluded that Plaintiff was not disabled, and denied her claims for SSI. T 43.

## IV. STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries. *See* 42

3

U.S.C. § 405(g). First, the Court determines whether the Commissioner applied the correct legal standard. *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). Second, the Court must determine whether the Commissioner's findings are supported by substantial evidence in the administrative record. *See Tejada*, 167 F.3d at 773; *Balsamo*, 142 F.3d at 79. A Commissioner's finding will be deemed conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *see also Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)("It is not the function of a reviewing court to determine *de novo* whether a Plaintiff is disabled. The [Commissioner's] findings of fact, if supported by substantial evidence, are binding.")(citations omitted). In the context of Social Security cases, substantial evidence consists of "more than a mere scintilla" and is measured by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(citation omitted). Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

**V.     DISCUSSION**

Plaintiff offers three grounds for challenging the ALJ's conclusions: 1) The ALJ's RFC determination is not supported by substantial evidence;  2) The ALJ erred in failing to make a proper credibility finding; and 3) The ALJ's Step 5 finding is not supported by substantial evidence. Each is addressed below.

**a.  The ALJ's RFC Finding**

Plaintiff contends that the ALJ's RFC finding is not supported by substantial evidence. In this

regard, Plaintiff argues that the ALJ improperly discounted the opinions from Dr. Dinello, Nurse Practitioner Catalone, and Dr. Kamin.

### 1. Opinions from Dr. Dinello and Nurse Practitioner Catalone[1]

On May 6, 2010, Plaintiff underwent a psychiatric consultation with Lakshman Prasad, M.D., of Oswego Hospital, Behavioral Services Division. T 241. Plaintiff reported getting angry and assaultive. T 241. She also indicated that she had a severe temper problem. T 241. Dr. Prasad diagnosed Plaintiff with impulse control disorder, anxiety disorder, depressive disorder, and antisocial personality disorder. T 241. Plaintiff thereafter treated with Dr. Presad on July 16, 2010, July 23, 2010, and August 5, 2010. Each time, Plaintiff was Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. On July 16, 2010, Plaintiff reported that none of the prescribed medications were helping her. T 189. She indicated that she stopped taking Depakote because "she was having thoughts of killing other people," and she reported lashing out at others for no reason. T 189. Plaintiff reported feeling nervous, anxious, and angry. T 189. Dr. Prasad discontinued Plaintiff's prescriptions for Depakote, BuSpar, and Pristiq; he prescribed 40mg of Geodon a night and 50mg of Vistaril twice a day. T 189. On July 23, 2010, Plaintiff stated that her attitude had improved and that her anxiety was "a lot better," although she was "still a little agitated." T 188. On August 5, 2010, Plaintiff reported feeling nervous, and Dr. Prasad observed her to be "visibly jittery." T 187. Plaintiff said she was "afraid that she might get in trouble with probation," and she felt "overwhelmed with her responsibilities." T 187. Dr. Prasad prescribed 50mg of Vistaril

---

[1]Dr. David Dinello and Nurse Practitioner Andrew Catalone work at the Oswego Hospital, Behavioral Services Division. Dr. Dinello is listed as the supervising physician on a medical source statement completed by Nurse Catalone and Dr. Dinello. Plaintiff's treatment at the Oswego Hospital, Behavioral Services Division is relevant to the ALJ's treatment of Dr. Dinello and Nurse Catalone's opinions.

three times a day and 40mg of Geodon every night. T 187.

On August 15, 2010, Plaintiff was admitted as an inpatient at Oswego Hospital, Behavioral Services Division. T 191-93. During that time, Plaintiff saw Vilas Patil, M.D. T 193. It was reported that "[Plaintiff] impulsively took forty Vistaril tablets that had been prescribed. Within a minute of taking the pills she realized what she had done was wrong and told her boyfriend what she had done. The boyfriend had her taken to the emergency room, from where she was medically cleared and admitted to the Inpatient Unit." T 191. Plaintiff reported that "she does poorly when she takes medications," and medications made her feel more suicidal "and she would much rather not take any medications." T 191. Dr. Patil repeated his assessment from April 2009, which was that "most of [Plaintiff's] problems were related to Personality Disorder," and he "did not see that she was going to benefit from any medications." T 191. Later in his evaluation report, Dr. Patil repeated: "As I have indicated before, a lot of patient's problems are related to impulsivity and her Personality Disorder. She is not likely to benefit from medication treatment." T 192. Dr. Patil diagnosed Plaintiff with adjustment disorder with disturbance of conduct and personality disorder with borderline and antisocial features. T 192. Plaintiff was assigned a GAF score of 50.[2] T 192. Plaintiff was discharged on August 17, 2010. T 191.

On August 19, 2010, Plaintiff met with Patrick McFalls, L.C.S.W., at Oswego Hospital, Behavioral Services Division. T 185-86. Plaintiff reported that she had recently been admitted as an inpatient after experiencing suicidal ideations, which could have been a side effect of her Geodon

---

[2]A GAF score of between 41 and 50 corresponds to "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV-TR") 32.

prescription. T 185. She also indicated that her goal was "to 'have a better attitude toward life,'" and to stop complaining as much, be less irritated, and yell less. T 185. Plaintiff "acknowledged [] struggling with depression and anxiety," and that her anxiety "[was] routed in being around large groups of people." T 185.

On August 25, 2010, Plaintiff treated with Nurse Catalone for irritability, anger, and depression. T 184. During a mental status examination, it was noted that Plaintiff's depression and anxiety fluctuated up and down, her affect was anxious, and her mood was depressed. T 184. It was noted that Plaintiff's Geodon prescription was discontinued, and Plaintiff was started on 10mg of Abilify and 100mg of Vistaril three times a day. T 184.

On September 16, 2010, Plaintiff treated with Dr. Prasad. T 237. Plaintiff reported that she continued to have bad mood swings and that she would get violent. T 237. Plaintiff's boyfriend, who attended the session with her, reported, "she got up this morning, she was wicked mad at me." T 237. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 237.

On October 13, 2010, Plaintiff treated with Nurse Catalone for irritability, anger, depression, and anxiety. T 236. Plaintiff indicated that her depression and anxiety fluctuated up and down. T 236. Nurse Catalone observed Plaintiff to have an anxious affect. T 236. Nurse Catalone discontinued Plaintiff's Vistaril prescription and started her on 100mg of Neurontin twice a day. T 236. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 236.

On November 3, 2010, Plaintiff treated with Nurse Catalone for irritability, anger, depression, and anxiety. T 233. Plaintiff reported continued problems with irritability, anger, and anxiety. T 233. Additionally, Plaintiff's depression and anxiety were noted to fluctuate up and down. T 233. Nurse

Catalone observed Plaintiff's affect to be anxious and mood depressed. T 233. She also had "some irritability and anger." T 233. Nurse Catalone recommended that Plaintiff continue with 10mg of Abilify, 160mg of Trileptal, and 100mg of Neurontin three times a day. T 233. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 233.

On December 15, 2010, Plaintiff treated with Nurse Catalone for irritability, anger, depression, and anxiety. T 230. Plaintiff reported an increase in her depression, anxiety, problems coping, mood swings, irritability, and anger. T 230. She also reported that she had been physically abusive to her boyfriend. T 230. Nurse Catalone observed her affect to be anxious and her mood to be depressed. T 230. Plaintiff was prescribed 15mg of Abilify, 200mg of Trileptal twice a day, 5mg of BuSpar three times a day, and her prescription for Neurontin was discontinued. T 230. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 230.

On January 13, 2011, Plaintiff treated with Nurse Catalone for irritability, anger, depression, and anxiety. T 228. Plaintiff reported that she still had "some underlying issues with the mood swings, irritability, and anger; however, she ha[d] noticed an improvement." T 228. Nurse Catalone recommended that Plaintiff continue with 15mg of Abilify, 5mg of BuSpar three times a day, he decreased her Trileptal to 300mg daily in an attempt to "wean" her off that prescription, and he started her on 20mg of Geodon at bedtime. T 228. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 228.

On February 8, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 227. Plaintiff reported feeling good that day, but overall continued to have problems with irritability, anger, and experienced mood swings. T 227. Nurse Catalone recommended Plaintiff continue her medications as prescribed—15mg of Abilify, 300mg of Trileptal, 5mg of BuSpar, and

20mg of Geodon. T 227.  Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 227.

On March 7, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 226.  Plaintiff reported that her depression and anxiety fluctuated up and down, and she continued to have problems with mood swings, irritability, and anger. T 226.  She also reported having physical problems with her boyfriend due to her aggressiveness. T 226. Nurse Catalone prescribed 15mg of Abilify, 300mg of Trileptal, 5mg of BuSpar three times a day, and he increased her Geodon to 80mg at bedtime. T 226.  Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 226.

On April 5, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 225.  Plaintiff reported that her depression and anxiety and concentration and focus fluctuated up and down, and she continued to have problems with mood swings, irritability, anger, and violence towards her boyfriend. T 225.  Plaintiff's boyfriend reported that he had called the police recently due to her increased anger and assaultive behavior. T 225.  However, Plaintiff indicated that her medications were helping. T 225.  Nurse Catalone observed Plaintiff's affect to be anxious and her mood depressed. T 225.  Nurse Catalone increased Plaintiff's Geodon prescription to 80mg at bedtime, and recommended she continue 15mg of Abilify, as Plaintiff could not handle a higher dosage due to the acathesia. T 225.  Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 225.

On April 19, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 224.   It was reported that Plaintiff was doing well on the Abilify and Geodon polypharmacy approach and was feeling better. T 224. Plaintiff stated that her anxiety was now

"much better controlled," and that she felt "much better at this time." T 224. Plaintiff indicated that she had broken up with her abusive boyfriend, and had started dating a new boyfriend. T 224. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 224.

On June 15, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 222. Plaintiff indicated that her depression and anxiety fluctuated up and down. T 222. Plaintiff was prescribed 80mg of Geodon, 15mg of Abilify, 15mg of BuSpar twice a day, and 100mg of Trazodone at bedtime. T 222. It was indicated that "[t]he reason for the polypharmacy of the Abilify and Geodon, this is what she was prescribed when she was in Tully Hill Inpatient Rehab Program so we continued the medications that they prescribed." T 222. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 222.

On July 13, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 221. Plaintiff indicated that she continued to have problems with depression, anxiety, and coping, and was experiencing mood swings, irritability, and anger. T 221. She reported that the medications helped, but had not resolved all of her symptoms. T 221. Nurse Catalone observed Plaintiff's affect to be anxious and her mood depressed. T 221. Plaintiff was prescribed 80mg of Geodon at bedtime, 16mg of Abilify in the morning, 15mg of BuSpar twice a day, and 100mg of Trazodone at bedtime. T 221. Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 221.

On August 10, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 220. Plaintiff indicated that her depression and anxiety fluctuated up and down, as did her appetite and sleep. T 220. Nurse Catalone observed Plaintiff's affect to be anxious and her mood

10

depressed. T 220.  Plaintiff was prescribed 25mg of Vistaril three times a day, 50mg of Pristiq every morning, and 150mg of Seroquel XR at 7pm. T 220.  Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder. T 220.

On September 6, 2011, Plaintiff treated with Nurse Catalone for depression, anxiety, irritability, and anger. T 219.  Plaintiff stated that her depression and anxiety were controlled by medications. T 219.   Plaintiff was instructed to continue her medications—25mg of Vistaril at bedtime, 50mg of Seroquel at 7:00pm, and 50mg of Pristiq. T 219.  Plaintiff was diagnosed with impulse control disorder, anxiety disorder, and depressive disorder.  T 219.

On November 16, 2011, Dr. Dinello and Nurse Practitioner Catalone completed a medical source statement regarding Plaintiff's mental abilities and limitations. T 243-45.  Plaintiff's diagnoses were mood disorder, rule out bipolar mixed type, impulse control disorder, and borderline personality disorder. T 243.  It was also indicated that Plaintiff's prognosis was guarded. T 243.  Regarding symptoms, Plaintiff exhibited, *inter alia*: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; generalized persistent anxiety; difficulties concentrating; paranoid thinking or inappropriate suspiciousness; recurrent obsessions; impaired impulse control; persistent disturbances of mood or affect; easy distractibility; memory impairment; and recurrent panic attacks. T 243.  Regarding Plaintiff's abilities, Plaintiff was unable to meet competitive standards in a number of activities, including, *inter alia*: maintaining attention for two-hour segments; maintaining regular attendance; sustaining an ordinary routine; completing a normal workday without interruptions from psychologically based symptoms; respond appropriately to criticism from supervisors; get along with co-workers or peers; respond appropriately to changes in a work setting; deal with normal work stress; and interact with

11

the general public. T 244-45. It was specifically written that Plaintiff has "very poor impulse control, rage, irritability, anger, poor social skill[s], violent behavior, [and is] physically aggressive." T 244. Finally, it was opined that Plaintiff would be off-task more than 20% of the time and absent from work more than 4 days per month. T 245.

### 2. Opinion from Dr. Kamin

On November 15, 2010, State Agency consultant, E. Kamin, Psychology, found that Plaintiff suffered from depressive disorder, anxiety disorder, impulse control disorder, and antisocial personality. T 194-208. Dr. Kamin also found that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in social functioning and maintaining concentration, persistence, or pace, and experienced one or two episodes of decompensation. T 204-05.

That same date, Dr. Kamin also completed a mental residual functional capacity assessment. T 209-12. Dr. Kamin opined that Plaintiff was moderately limited in the following abilities: understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention for extended periods of time; completing a normal workday or workweek without interruptions from psychologically based symptoms; interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the workplace; setting realistic goals and making plans independently of others. T 210. Dr. Kamin supported his evaluation by referencing Plaintiff's treatment notes and consultative examination. T 211.

### 3. Other Relevant Medical Opinion

On September 13, 2010, Plaintiff underwent a consultative examination with Dennis M. Noia,

Ph. D. T 177-81. Plaintiff reported living with her boyfriend, and indicated that she had obtained her GED. T 177. Plaintiff reported no formal thought disorder or cognitive dysfunction, and indicated that her symptoms had improved with treatment. T 178. She also indicated that she dressed, bathed, and groomed independently, and cooked, cleaned, did laundry, shopped, managed money, and enjoyed reading. T 180. Plaintiff also reported that during her prior employment, she had difficulty getting along with others, and due to her psychiatric problems was unable to work at all. T 177. Plaintiff reported that she had been hospitalized twice before for suicidal thoughts and attempt, and she had been treating with Oswego County Mental Health every 2 weeks since April 2010. T 177. Regarding other daily activities, Plaintiff reported that she shopped when the "stores [were] relatively empty," she did not drive or use public transportation, and she "ha[d] difficulty getting along with friends and family." T 180. When asked about her symptoms, Plaintiff reported that when she felt depressed, she experienced dysphoric moods, psychomotor retardation, crying spells, hopelessness, loss of usual interests, increased irritability, fatigue, loss of energy, low self-esteem, problems with memory, and occasional thoughts of suicide; when she felt manic, she was more talkative, her speech was pressured, and she had a decreased need for sleep; when she felt anxious, she experienced being easily fatigued, increased irritability, restlessness, and excessive worrying thoughts. T 178. Plaintiff indicated that "treatment has improved her symptoms, but [her] symptoms still frequently occur." T 178.

During the mental status examination, Dr. Noia observed Plaintiff's mood to be anxious and that Plaintiff "was somewhat tense and apprehensive." T 179. Dr. Noia found that Plaintiff exhibited adequate social skills, full orientation, coherent and goal-directed thought processes, and fair insight and judgment. T 179. She had coherent and goal-directed thought processes with no evidence of

delusions, hallucinations, or disordered thinking. T 179. Her attention and concentration were intact, she had a clear sensorium, and she was fully oriented. T 179. She was also able to perform serial threes, simple calculations, and counting exercises. T 179. Recent and remote memory were only mildly impaired. T 179. Dr. Noia estimated her to be in the low average intellectual functioning range, with a general fund of information appropriate to her experience. T. 179. Additionally, Dr. Noia found that she had fair insight and judgment. T 179. Dr. Noia also indicated that Plaintiff's "recent and remote memory skills were mildly impaired," and Plaintiff's intellectual functioning was estimated to be in the low average range. T 179. Dr. Noia diagnosed Plaintiff with bipolar disorder and anxiety disorder. T 180.

In his medical source statement, Dr. Noia opined that Plaintiff could regularly attend to a routine schedule, could perform simple and some complex tasks with supervision and independently, and appeared cooperative with adequate social skills. T 179. Dr. Noia also found that Plaintiff was capable of understanding and following simple instructions and directions; performing simple and some complex tasks with supervision and independently; maintaining attention and concentration for tasks; attending to a routine and maintaining a schedule; learning new tasks; making appropriate decisions; and relating to and interacting moderately well with others. T 180. Dr. Noia did, however, indicate that while Plaintiff could interact "moderately well" with others, she did have "difficulty dealing with stress." T 180.

### 4. The ALJ's RFC Determination

As indicated above, that ALJ found that Plaintiff retained the RFC to perform a full range of work at all exertional levels, but would need to avoid concentrated use of all heavy moving machinery such as automobiles and forklifts and avoid all concentrated exposure to unprotected heights. T

39-40.  Further, the ALJ found that Plaintiff was precluded from working in fast-paced production rate environments, and could tolerate only occasional and superficial direct customer service with the public. T 39-40.  The ALJ found that Plaintiff could understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; could interact appropriately with supervisors and coworkers in a routine work  setting; and could respond to usual work situations and to changes in a routine work setting.  T 39-40.  In reaching the RFC determination, the ALJ indicated that he considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. The ALJ also indicated that he considered opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In reaching his RFC determination, the ALJ wrote:

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functioning.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

The claimant testified that she is disabled because of her anger, irritability and anxiety. She reported that she cannot handle pressure and suffers from panic attacks at least once a week. She also reported that her depressive [*sic*] makes it impossible for her to get out of bed which she estimated happens at least 4 times per week.  The claimant reported that she has issues with her mother and has difficulty with focus and concentration. She reported that she sees nurse practitioner, Andrew Catalone, once a month for counseling and medication

management and when necessary more than once a month. Regarding drug use, the claimant admitted that she has been sober since April 2011. The claimant reported that she lives with her mother. She did report that she does the dishes once a week but she does not "really" help with any of the household chores. However, the claimant reported in a disability report completed in September 2010 that she lives with her boyfriend, is able to prepare "all different kinds" of food, and is able to do the "dishes, laundry, dusting, sweeping, mopping and vacuuming" unassisted (Exhibit 3E).

Although the record supports the claimant's anxiety and depression, the record does not demonstrate limitations consistent with the claimant's allegations. The claimant was followed at the Oswego Hospital Behavioral Services from August 2010 through September 2011 (Exhibit 2F and 6F). She was diagnosed with impulse control disorder, not otherwise specified, anxiety disorder, not otherwise specified, depressive disorder, not otherwise specified and polysubstance abuse history. The treatment history reflects that the claimant's depression and anxiety symptoms are relatively controlled on medication. The claimant was prescribed Trileptal, Vistaril and Abilify. Exacerbations in her symptoms seem to coincide with problems in her relationship with her then boyfriend, her struggle with drug use, incarceration and changes to her prescription medication. In October 2010, progress notes indicate the claimant was in a pleasant mood and was smiling. She reported having some thoughts of suicide but described them as "fleeting." By January 2011, the claimant reported that she noticed improvement in her mood, irritability and anger and denied any paranoia. Most recent treatment notes in September 2011 indicate that the claimant's depression and anxiety are controlled and her concentration and focus are good (Exhibit 6F, p. 1 ).

The claimant underwent consultative examination with Dennis M. Noia in September 2010 (Exhibit lF). The claimant reported that she was hospitalized in April 2009 for suicidal thoughts and again in August 2010 for suicide attempt. She reported depression, anxiety and manic symptoms, which have resulted in fatigue, loss of energy, and difficulties with memory and sleep. She admitted to having a previous problem with heroin but reported that she does not currently abuse the drug. Although the claimant presented as anxious during mental status examination, she was cooperative and appropriate. Her thought processes were goal directed and evidenced no hallucinations or disordered thinking. She was oriented to person, place and time and her sensorium was clear. Dr. Noia found the claimant's attention and concentration to be intact but her recent and remote memory skills were mildly impaired. Although the claimant's cognitive functioning was estimated to be in the low average range, her insight and judgment was fair. Dr. Noia assessed the claimant with bipolar disorder, anxiety disorder and heroin use in remission.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. For instance, the claimant reported during consultative

examination that she is able to maintain personal hygiene and grooming, perform household chores, do laundry, shop, and cook. She did report some difficulty interacting with friends and family and reported that she spends her time reading (Exhibit 1F, p. 2). These activities demonstrate the claimant is not as limited as she purports and are not inconsistent with the residual functional capacity detailed above.

Regarding opinion evidence, Dr. Noia opined the claimant is able to understand and follow simple instructions and capable of maintaining the appropriate attention and concentration. He further opined the claimant is capable of making decisions and interact moderately well with others but would have some difficulty handling work stresses. This opinion is given great weight because it is consistent with Dr. Noia's own examination and the limited medical evidence of record. It is also consistent with the claimant's reported full activities of daily living and few functional limitations (Exhibit 1F).

A medical source statement completed by Dr. David Dinello from the Oswego Hospital of Behavioral Services completed in November 2011 rates the claimant as unable to meet competitive standards in mostly all mental abilities. He points to the claimant's "very poor impulse control, rage, irritability, anger, poor social skills, violent behavior and physical [aggression]" (Exhibit 7F, p. 2). He further opines the claimant would be off task for more than 20% in an 8 hour workday and would be absent from work more than four days per month because of her mental impairments. This opinion is given little weight because it is simply not supported in the medical evidence. The treatment record from Oswego Hospital of Behavioral Services indicate the claimant's symptoms, although severe, are controlled with medication and counseling.

A mental residual functional capacity assessment completed in November 2010 by E. Kamin suggests the claimant is capable to performing simple work but would be have moderate difficulty dealing with stress and would be able to interact and relate to others "moderately well" (Exhibit 4F). This opinion is given no weight as it is unclear whether it is rendered by a medical consultant or single decision maker. Nevertheless, the opinion is supported by the weight of the medical evidence.

T 40-42 (brackets in original) .

### 5. Parties' Contentions

Plaintiff takes issue with the ALJs decision to give little weight to the opinion of Dr. Dinello as expressed in the medical source statement. T 42. Plaintiff argues that Dr. Dinello's opinion, being from a treating physician, must be given controlling weight because it is well supported by Nurse Catalone's treatment notes, and is consistent with Drs. Noia and Kamin's opinions that Plaintiff

would have difficulties interacting with others (including supervisors and coworkers) and dealing

with stress in the workplace.  Further, Plaintiff asserts that the ALJ's statement that Plaintiff's

symptoms "are controlled with medication and counseling" is contradicted by the record which shows

that her medication was continually altered because she reported problems with anger, irritability, and

mood swings.   Plaintiff also argues that the ALJ erred in discounting Dr. Dinello's opinion because

he did not specifically discuss the factors set forth at 20 C.F.R. §§ 416.927(d)(2)-(6).

In addition, Plaintiff argues that the ALJ erred when he gave "no weight"

to Dr. Kamin's opinion because he could not determine Dr. Kamin's status.  Plaintiff argues that,

based upon the records submitted by Dr. Kamin, it was clear that he was a medical consultant and,

therefore, his opinion should have been given great weight and its limitations included in the RFC.[3]

Defendant argues that the medical evidence amply supports the ALJ's RFC finding.

Defendant points out that Plaintiff was prescribed psychotropic medications at Oswego Hospital,

Behavioral Services Division on June 15, 2010, and had her medications adjusted on several

occasions thereafter.  T 240; see T 184-85, 187, 189, 221, 227.   The ALJ noted that through the use

of her medications, Plaintiff routinely exhibited normal memory, fair-to-good concentration and

focus, clear thought processes, alertness with full orientation, no evidence of psychotic symptoms, no

suicidal or homicidal ideation, and no hallucinations or delusions. T 40-42 (*referring to* T 184,

187-88, 190, 192, 219-22, 224-25, 227-28, 235-40).  The ALJ observed that Plaintiff's symptoms of

depression and anxiety appeared "relatively" controlled with medications.  T 40.  Defendant argues

---

[3]Dr. Kamin recognized that Plaintiff was moderately limited in any activities involving other people,
including interacting appropriately with the general public, accepting instructions and responding
appropriately to criticism from supervisors, and getting along with coworkers without distracting them or
exhibiting behavioral extremes. T 210.

that the ALJ's conclusion in this regard is supported by substantial evidence. Plaintiff stated at her July 23, 2010 appointment that her attitude had improved and that her anxiety was "a lot better." T 188. In the late fall of that year, Plaintiff reported taking a trip to Texas to visit her boyfriend's parents. *See* T 232-34. Plaintiff continued to indicate that her medications were helping at her April 5, 2011 appointment. T 225. On April 19, 2011, she stated that her anxiety was now "much better controlled," and that she felt "much better at this time." T 224. Plaintiff indicated that she had broken up with her abusive boyfriend, and had started dating a new boyfriend. T 224. She reported improvement again at her July 13, 2011 appointment, where she stated that her medications continued to help despite not resolving all of her symptoms. T 221. Likewise, at her September 6, 2011 appointment, Plaintiff stated that her depression and anxiety were controlled by medications. T 219.

Defendant points out that the ALJ addressed the September 13, 2010 findings from consultative examiner Dr. Noia, *see* T 41 (*referring to* T 177-83), which also supports the RFC. There, Plaintiff reported living with her boyfriend, and indicated that she had obtained her GED. T 177. Plaintiff reported no formal thought disorder or cognitive dysfunction, and stressed that her symptoms had improved with treatment. T 178. She indicated that she dressed, bathed, and groomed independently, and also cooked, cleaned, did laundry, shopped, managed money, and enjoyed reading. T 180.

On examination, Dr. Noia found that Plaintiff exhibited adequate social skills, full orientation, coherent and goal-directed thought processes, and fair insight and judgment (Tr. 179). She had coherent and goal-directed thought processes with no evidence of delusions, hallucinations, or disordered thinking. T 179. Her attention and concentration were intact, she had a clear sensorium, and she was fully oriented. T 179. She was also able to perform serial threes, simple calculations,

and counting exercises. T 179. Recent and remote memory were only mildly impaired. T 179. Dr. Noia estimated her to be in the low average intellectual functioning range, with a general fund of information appropriate to her experience. T. 179. Additionally, Dr. Noia found that she had fair insight and judgment. T 179.

Ultimately, Dr. Noia found that Plaintiff could regularly attend to a routine schedule, could perform simple and some complex tasks with supervision and independently, and appeared cooperative with adequate social skills. T 179. Dr. Noia also found that Plaintiff was capable of understanding and following simple instructions and directions; performing simple and some complex tasks with supervision and independently; maintaining attention and concentration for tasks; attending to a routine and maintaining a schedule; learning new tasks; making appropriate decisions; and relating to and interacting moderately well with others. T 180. Dr. Noia did, however, indicate that Plaintiff faced difficulties dealing with stress. T 180.

It is Defendant's position that, in considering these findings, the ALJ adequately accommodated Plaintiff's mental limitations. T 39-40. Due to Dr. Noia's finding that Plaintiff faced difficulties in dealing with stress, the ALJ precluded her from working in fast-paced production rate environments. T 39-40 (*referring to* T 180). Likewise, due to difficulties with her abusive boyfriend and her history of anxiety and depression, the ALJ further limited Plaintiff to only occasional and superficial direct customer service with the public. T 39-40. Defendant maintains that, despite the fact that Plaintiff routinely showed fair-to-good concentration, and normal or mildly impaired memory, "the ALJ generously extended her the benefit of the doubt" and indicated that she could understand, remember, and carry out simple instructions; make judgments on simple work-related decisions; and could respond to usual work situations and to changes in a routine work setting. T

39-40. Thus, Defendant asserts, there is substantial evidence supporting the ALJ's conclusion to limit Plaintiff's RFC consistent with of her mental impairments.

Defendant also argues that the ALJ properly discounted Dr. Dinello's opinion because, for the reasons discussed above, the November 16, 2011 assessment was not well-supported by the medical evidence and was inconsistent with other substantial evidence. Defendant also notes that Nurse Catalone is not an "acceptable medical source" under the Commissioner's regulations, and thus his opinion was not entitled to controlling weight. *See* 20 C.F.R. §§ 416.913(a), (d), 416.927(a)(2); SSR 06-03p; *Genier v. Astrue*, 298 Fed.Appx. 105, 108-09 (2d Cir. 2008) (the ALJ was free to discount the assessments of a physicians' assistant and a nurse practitioner, who were not "acceptable medical sources," in favor of the objective findings of the medical doctors).[4]

Defendant contends that while Dr. Kamin is a psychologist and not a single decision maker, the ALJ merely referred to an ambiguity in Dr. Kamin's status. *See* T 42 ("…it is unclear whether [the assessment] is rendered by a medical consultant or single decision maker"). Defendant argues that the RFC restricted Plaintiff consistent with the moderate limitations assessed by Dr. Kamin, T 39-40 (*referring* to T 204-05, 209-11), and, thus, any error by the ALJ in recognizing Dr. Kamin's status was harmless.

### 6. Analysis - Plaintiff's First Ground

The Court finds, for the reasons asserted by Defendant, that the ALJ's RFC determination is supported by substantial evidence. While Plaintiff had a long-standing and regular treatment relationship with Oswego Hospital, Behavioral Services Division, including with Nurse Practitioner

---

[4]Defendant acknowledges that evidence from other sources may be used to show the severity of the individual's impairment and how it affects the individual's ability to function.

Catalone, the records provide substantial evidence to support the ALJ's conclusion that Plaintiff can perform work of a limited nature consistent with the RFC finding. The fact that Plaintiff's medication was changed on several occasions does not mean that medicinal and counseling treatment was, or will be, ineffective. Indeed, as pointed out by Defendant, while Plaintiff had problems with the medications she was on in 2010, by 2011 she began to repeatedly reported that her symptoms were better control by her new medicines and that she was able to do relatively normal daily activities.

Dr. Dinello's opinion was properly discounted because it was not supported by the medical evidence, including the treatment records from Oswego Hospital, Behavioral Services Division, Dr. Noia, and Dr. Kamin. *See Woodmancy v. Colvin*, 577 F. App'x 72, 74 (2d Cir. 2014)(Summary Order)("'[W]hile a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence.'")(quoting *Byam v. Barnhart,* 336 F.3d 172, 183 (2d Cir. 2003) and citing *Perez v. Chater,* 77 F.3d 41, 48 (2d Cir. 1996)).

While the ALJ did not specifically address the 20 C.F.R. § 404.1527(c)(1)-(6) factors in relation to Dr. Dinello's opinion expressed in the medical source statement, he did provide good reasons for his determination to afford this opinion little weight. As indicated in the ALJ's decision, he reviewed all of the medical records in evidence, including Plaintiff's treatment history with Oswego Hospital, Behavioral Services Division. He indicated that Dr. Dinello's opinion was given little weight because it was not supported in "the medical evidence," which he had examined in the preceding paragraphs, and because the treatment record from Oswego Hospital, Behavioral Services Divisions indicate the claimant's symptoms, although severe, were "relatively controlled" with medication and counseling. As the Court has indicated, there is substantial evidence to support the

ALJs conclusion on both points - including that Plaintiff's symptoms were "relatively controlled with medication and counseling. Because the reasons supporting the ALJs determination to give Dr. Dinello's opinion little weight are apparent from the ALJ's written decision, the Court finds no reason for remand.

The ALJ also properly credited Dr. Noia's opinion most highly. The Commissioner's regulations permit the opinions of non-treating sources, if supported by evidence in the record, to override treating sources' opinions. *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993); *see* 20 C.F.R. § 416.927(f)(2)(iii). As the ALJ's discussion shows, Dr. Noia's findings were consistent with Plaintiff's longitudinal medical treatment at the Oswego Hospital, Behavioral Sciences Division. The opinions of consultative and State agency doctors, like that of Dr. Noia, may constitute substantial evidence is supported by the medical evidence, *see Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011); *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983), which is the case here. T 41-42. As such, the ALJ reasonably found that the assessment completed by Dr. Dinello and Nurse Practitioner Catalone was not well-supported by Plaintiff's mental health treatment, and therefore, the ALJ appropriately assigned little weight to their overly restrictive assessment.

While the ALJ failed to properly analyze Dr. Kamin's status, *see* T 42 ("...it is unclear whether [the assessment] is rendered by a medical consultant or single decision maker"), he properly concluded that Dr. Kamin's findings supported the RFC determination. *See* T 42 ("Nevertheless, the opinion is supported by the weight of the medical evidence."); T 210 (Dr. Kamin recognized that Plaintiff was only moderately limited in any activities involving other people, including interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers without distracting them or exhibiting behavioral

extremes.).  Thus, any error in failing to properly recognize Dr.  Kamin's status was harmless and does not require remand. *See McKinstry v. Astrue*, 511 F. App'x 110, 111-12 (2d Cir. 2013); *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

For these reasons, Plaintiff's motion on this ground is denied.

### b.  Credibility Evaluation

Next, Plaintiff contends that the ALJ erred in failing to make a proper credibility finding. She asserts that the ALJ erred when he found that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." T 41.

An ALJ has discretion to evaluate the credibility of a claimant and to make an independent judgment based on medical findings regarding the true extent of the claimant's symptoms. *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984); *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). It is the function of the Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Caroll v. Sec'y of Health and Human Serv.*, 705 F.2d 638, 642 (2d Cir. 1983); *see Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995)(An ALJ's determination with respect to the credibility of witnesses is given great deference because the ALJ heard the testimony and observed the demeanor of the witnesses).  Further, Plaintiff must produce appropriate, probative evidence in support of any subjective statements of symptoms, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4), and the ALJ's decision to discount Plaintiff's statements of symptoms must be accepted by a reviewing court unless it is clearly erroneous. *Centano v. Apfel*, 73 F. Supp. 2d 333, 338 (S.D.N.Y. 1999).  "An ALJ's evaluation of Plaintiff's credibility is entitled to great deference if it is supported by substantial evidence." *Nelson v. Astrue*,

2010 WL 3522304, at *6 (N.D.N.Y. Aug. 12, 2010).

When an individual has a medically determinable impairment that could reasonably be expected to produce the symptoms alleged, but the objective evidence does not substantiate the alleged intensity and persistence of the symptoms, the ALJ considers other factors in assessing the individual's subjective symptoms. These factors include: (1) Plaintiff's daily activities; (2) the nature, duration, frequency and intensity of her symptoms; (3) precipitating and aggravating factors; (4) the type of medication and other treatment or measures which Plaintiff uses to relieve pain and other symptoms; (5) treatment other than medication Plaintiff has received for relief of pain and other symptoms; (6) any other measures used by Plaintiff to relieve pain and other symptoms; and (7) other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3). However, the ALJ is not required to explicitly recite the seven factors set forth in 20 C.F.R. § 416.929(c)(3) when the credibility determination is supported by substantial evidence in the record. *See Cichocki v. Astrue*, 534 Fed. Appx. 71, 76 (2d Cir. 2013).

Plaintiff first takes issue with the ALJ's characterization of her participation in her activities of daily living. Pl. Bf. 18-20. While Plaintiff alleges that her participation in her daily activities was severely restricted, the ALJ properly noted that Plaintiff stated that she prepared many types of foods, washed the dishes, did laundry, dusted, swept, mopped, and vacuumed. T 40 (*referring* to T 141-43). Moreover, Plaintiff stated that she cared for a cat, attended to all of her personal care, read, and enjoyed spending time with her boyfriends. T 40 (*referring* to T 141-45). Additionally, Plaintiff testified that she used a computer to check social networks and for e-mail. T 22. Plaintiff also reported to Dr. Noia that she dressed, bathed, and groomed independently, and also cooked, cleaned, did laundry, shopped, managed money, and enjoyed reading. T 180. The ALJ's conclusion that

25

Plaintiff's participation in her activities of daily living was not severely restricted due to her mental impairments is accurate, and not a misstatement of facts as Plaintiff alleges. *See* Pl. Bf. 18-20.

Plaintiff also argues that the ALJ, in assessing her credibility, improperly attributed positive progress from her medications. Pl. Bf. 20-22. Plaintiff asserts that her medications continually changed, thereby indicating a problem. But the ALJ acknowledged that exacerbations on Plaintiff's symptoms necessitated changes in Plaintiff's medications. T 41. Yet, despite these exacerbations and the attendant changes in medications, the record reflects positive progress with the medications. Indeed, Plaintiff reported on numerous occasions that her medications helped her attitude and anxiety, and assisted in controlling her symptoms. *See* T 188, 219, 221, 224-25. The ALJ also noted that Plaintiff's mental impairments were not fully controlled, but rather were "relatively" controlled with medications. T 41. The RFC appropriately accommodated Plaintiff for symptoms that were not completely controlled. T 39-40. Thus, the Court finds that the ALJ's credibility determination relative to the impact of Plaintiff's medication is supported by substantial evidence.

Additionally, the ALJ pointed to instances in the record that called into question Plaintiff's veracity. Despite alleging disabling mental symptomatology, Plaintiff reported taking a trip to Texas in late fall 2010 to visit her boyfriend's parents. T 232-34. Moreover, Plaintiff tested positive for marijuana on several occasions (narrowly avoiding a probation violation), *see* T 232, 242; failed to attend treatment sessions with psychologist Dr. Scott P. Moerfley, T 223; and failed to attend subsequent appointments for medications following an emergency room visit at Oswego Hospital, T 192. This provides substantial evidence supporting the ALJ's determination to discredit Plaintiff's veracity as to the effects of her symptoms. *See* SSR 96-7p (noting that a claimant's statements may be less credible if records show a failure to comply with treatment).

The Court finds that the ALJ's conclusion that Plaintiff was less than fully credible in reporting the intensity, persistence, and limiting effects of her symptoms is amply supported by the record. Plaintiff's motion on this ground is denied.

### c. Step 5 Finding

Next, Plaintiff argues that the ALJ's Step 5 finding is not supported by substantial evidence. In this regard, she argues that "based on the ALJ's foregoing errors regarding determining Plaintiff's RFC determination and in assessing her credibility, the hypothetical question posed to the VE could not be considered a full and accurate portrayal of all of Plaintiff's limitations. Consequently, the VE's responses were based upon an incomplete hypothetical question, and this matter should be remanded for further administrative proceedings." Pl. Bf. 22.

As is apparent, Plaintiff's motion in this regard rests on the presumption that she has adequately proved her first two grounds for relief. However, because Plaintiff has prevailed on neither of the first two grounds for relief, her motion on this ground is also denied.

## VI.  CONCLUSION

The Court finds that the Commissioner applied the correct legal standards, and there is substantial evidence to support her factual determinations. Therefore, Plaintiff's motion for judgment on the pleadings is **DENIED**, Defendant's motion for judgment on the pleadings is **GRANTED**, and the Court **AFFIRMS** the final decision of the Commissioner.

**IT IS SO ORDERED.**

Dated:March 27, 2015

Thomas J. McAvoy
Senior, U.S. District Judge